TIME, INC., Plaintiff,

v.

Donald T. REGAN, Secretary of the Treasury, H. Stuart Knight, Director, United States Secret Service, William French Smith, Attorney General of the United States; James R. D'Amelio, Special Agent in Charge, New York Field Office, United States Secret Service, John S. Martin, Jr., United States Attorney for the Southern District of New York, Defendants.

No. 81 Civ. 3218 (VLB).

United States District Court, S. D. New York.

June 4, 1982.

Cravath, Swaine & Moore by Frederick A. O. Schwarz, Jr., New York City, for plaintiff.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for defendants.

## OPINION·

VINCENT L. BRODERICK, District Judge.

■ This civil action, in which plaintiff seeks declaratory and injunctive relief, involves a challenge to the constitutionality of two provisions of the federal anti-counterfeiting laws that either prohibit or regulate the publication or production of any likeness of United States currency. Jurisdiction of this court rests on 28 U.S.C. § 1331, as amended Dec. 1, 1980, Pub.L. 96–486, § 2(a), 94 Stat. 2369. Declaratory relief is sought under 28 U.S.C. §§ 2201 and 2202 (1976).[1]

Plaintiff Time Inc. ("Time") is a New York corporation with its principal place of business in New York City. It publishes various periodicals—*Time, Fortune, Sports Illustrated, Life, Money, People,* and *Discover.*[2] Defendants are various United States Government officials who are statutorily charged with the administration and enforcement of the counterfeiting laws of the United States.[3]

Plaintiff alleges that the challenged provisions are overbroad and void for vagueness, and that they impermissibly infringe upon plaintiff's First Amendment rights of freedom of speech and of the press.[4] Plaintiff has moved and defendants have cross-moved for summary judgment. Fed.R. Civ.P. 56.

## II.

The United States Constitution grants Congress broad power to legislate to "coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures," art. I, § 8, cl. 5, and to "provide for the Punishment of

1. 28 U.S.C. § 2201, captioned "Creation of remedy," provides that:
   In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
   28 U.S.C. § 2202, captioned "Further relief," provides that:
   Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.
   Both sections are procedural in nature, designed to simplify the ascertainment of uncertain rights, *Coomes v. Adkinson,* 414 F.Supp. 975 (D.S.D.1976), and neither serves as an independent predicate for federal court jurisdiction. *Donahue v. Butz,* 363 F.Supp. 1316 (N.D. Cal.1973). Sections 2201 and 2202 may be resorted to for additional remedies in situations where jurisdiction already exists. *Terminal Freight Handling Co. v. Solien,* 444 F.2d 699 (8th Cir. 1971), *cert. denied,* 405 U.S. 996, 92 S.Ct. 1246, 31 L.Ed.2d 465 (1972). Plaintiff properly invokes §§ 2201 and 2202 as there exists an independent basis for jurisdiction, namely 28 U.S.C. § 1331.

2. *Fortune* and *Money* focus primarily on matters pertaining to finance and the economy, while the other magazines report from time to time on financial matters and issues (*Time* and *Life*), or may refer from time to time to such matters and issues in the course of treating the areas in which they specialize (*Sports Illustrated, People,* and *Discover*).

3. Donald T. Regan is Secretary of the United States Department of the Treasury, responsible for the enforcement of the laws of the United States which define, and provide for the punishment of, counterfeiting and forgery of United States currency. H. Stuart Knight is Director of the United States Secret Service, a division of the Department of the Treasury, and is responsible for the detection and arrest of persons who violate federal counterfeiting laws. William French Smith is the Attorney General of the United States, responsible for the administration of the United States Department of Justice, including its activities with respect to the nation's penal laws. James R. D'Amelio is Special Agent in Charge of the New York Field Office of the United States Secret Service. John S. Martin, Jr. is the United States Attorney for the Southern District of New York.

4. The First Amendment to the United States Constitution reads as follows:
   Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

counterfeiting the Securities and current Coin of the United States." Art. I, § 8, cl. 6. The power to coin money has been long recognized as carrying the correlative power to protect it. *United States v. Marigold*, 50 U.S. 560, 9 How. 560, 13 L.Ed. 257 (1850). The *Marigold* Court upheld an Act of Congress, 4 Stat. at Large 121, ch. 65, providing for the prosecution of those involved in counterfeiting any coin in the resemblance of United States currency.

Chapter 25 of Title 18 of the United States Code contains those laws which prohibit the alteration, counterfeiting or forgery of the coins, obligations and securities of the United States Government and of foreign governments, and which provide criminal sanctions with respect to such activities.

This case involves the impact of two of the provisions of Chapter 25—the sixth paragraph of § 474, and § 504.

5. 18 U.S.C. § 474 reads as follows:

Whoever, having control, custody, or possession of any plate, stone, or other thing, or any part thereof, from which has been printed, or which may be prepared by direction of the Secretary of the Treasury for the purpose of printing, any obligation or other security of the United States, uses such plate, stone, or other things, or any part thereof, or knowingly suffers the same to be used for the purpose of printing any such or similar obligation or other security, or any part thereof, except as may be printed for the use of the United States by order of the proper officer thereof; or

Whoever makes or executes any plate, stone, or other thing in the likeness of any plate designated for the printing of such obligation or other security; or

Whoever sells any such plate, stone, or other thing, or brings into the United States any such plate, stone, or other thing, except under the direction of the Secretary of the Treasury or other proper officer, or with any other intent, in either case, than that such plate, stone, or other thing be used for the printing of the obligations or other securities of the United States; or

Whoever has in his control, custody, or possession any plate, stone, or other thing in any manner made after or in the similitude of any plate, stone, or other thing, from which any such obligation or other security has been printed, with intent to use such plate, stone, or other thing, or to suffer the same to be used in forging or counterfeiting any such

*1. 18 U.S.C. § 474.*

18 U.S.C. § 474 (1976) is one of 39 sections in Chapter 25, and is captioned "Plates or stones for counterfeiting obligations or securities." [5] Paragraphs one through five and paragraph seven of § 474 criminalize the possession, use, importation, sale and forgery of materials which can actually be used for counterfeiting purposes, such as plates, stones and paper. The sixth paragraph of § 474, one of the provisions challenged herein, makes it a crime to create a photograph, print or impression of "any obligation or other security made or executed, in whole or in part, after the similitude of any obligation or other security issued under the authority of the United States":

\* \* \* \* \* \*

Whoever prints, photographs, or in any other manner makes or executes any engraving, photograph, print, or impression in the likeness of any such obligation or obligation or other security, or any part thereof; or

Whoever has in his possession or custody, except under authority from the Secretary of the Treasury or other proper officer, any obligation or other security made or executed, in whole or in part, after the similitude of any obligation or other security issued under the authority of the United States, with intent to sell or otherwise use the same; or

Whoever prints, photographs, or in any other manner makes or executes any engraving, photograph, print, or impression in the likeness of any such obligation or other security, or any part thereof, or sells any such engraving, photograph, print, or impression, except to the United States, or brings into the United States, any such engraving, photograph, print, or impression, except by direction of some proper officer of the United States; or

Whoever has or retains in his control or possession, after a distinctive paper has been adopted by the Secretary of the Treasury for the obligations and other securities of the United States, any similar paper adapted to the making of any such obligation or other security, except under the authority of the Secretary of the Treasury or some other proper officer of the United States—

Shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

June 25, 1948, ch. 645, 62 Stat. 706.

other security,[6] or any part thereof, or sells any such engraving, photograph, print, or impression, except to the United States, or brings into the United States, any such engraving, photograph, print, or impression, except by direction of some proper officer of the United States;

\* \* \* \* \* \*

Shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

18 U.S.C. § 474 ¶ 6.

Section 474 traces its roots to Section 11 of "An Act to provide Ways and Means for the Support of the Government, and for other Purposes," ch. 172, 13 Stat. 218, 221–222, which was enacted on June 30, 1864.

Drafted as a measure to raise money for the War Between the States, the Act provided, *inter alia*, for the issuance of various federal obligations, and it set forth penal provisions with respect to the counterfeiting and forgery of federal obligations. Thus Section 10 of the Act provided criminal sanctions against the forgery, counterfeiting or alteration of United States obligations and the passing or uttering of counterfeits. Section 12 made it a federal crime to possess without lawful authorization "any engraved or transferred plate, block, or electrotype" from which U. S. obligations were or would be made; or any die, roll, or original work used in the making thereof; or any materials made "after the similitude" thereof.

Section 11 of the 1864 Act is the ancestor of Section 474. The sixth paragraph of Section 474 traces its genesis to the following language of Section 11:

... if any person shall print, photograph, or in any other manner make or execute, or cause to be printed, photographed, or in any manner made or executed, or shall aid in printing, photographing, making, or executing any engraving, photograph, or other print or impression in the likeness or similitude of any obligation or

other security, or any part or parts thereof, or shall vend or sell any such engraving, photograph, print, or other impression, except to the United States, or shall bring into the United States from any foreign place any such engraving, photograph, print, or other impression, except by the direction of some proper officer of the United States ... every person so offending shall be deemed guilty of a felony, and shall, on conviction thereof, be punished by fine not exceeding five thousand dollars, or by imprisonment and confinement at hard labor, not exceeding fifteen years, or by both, in the discretion of the court.

The proceedings of the 38th Congress shed virtually no light on its intent with respect to the anti-counterfeiting sections of the 1864 Act. The sole reference to § 11 in the course of the House pre-enactment consideration of the Act pertained to a modification of the sentence and fine provisions, which was made. There was apparently no significant discussion of § 11 in the Senate.

But Section 11 of the statute passed in 1864 to help finance the Union in the War Between the States is, in substance, the law of the United States today. With minor changes in language, it was re-enacted as § 5430 of the Revised Statutes of 1878, Tit. LXX, ch. 5, Rev.Stat. 1052 (December 1, 1878), and re-enacted again as § 150 of the codification of 1909, ch. 321, 35 Stat. 1116 (March 4, 1909). As revised in 1909, the substance of Section 11 made its way through the first three editions of the United States Code; it was re-enacted once again with minor changes in phraseology in the 1946 recodification of the penal laws, *see* ch. 645, 62 Stat. 706 (1948), and appears in that form in Section 474 of Title 18.

*2. 18 U.S.C. § 504.*

18 U.S.C. § 504 (1976), which is the second provision challenged in this action,

---

**6.** The antecedent of the words "any such obligation or other security" in the sixth paragraph of Section 474 appear in the fifth paragraph of Section 474, and are quoted in this opinion immediately before the text of the sixth paragraph. *See* fn. 5, *supra*, for full text of Section 474.

was substantially amended in 1958 to provide certain statutory exemptions to the flat ban of § 474. Notwithstanding the prohibitions contained in the sixth paragraph of § 474, § 504 permits the printing or publishing "of illustrations" of United States currency "for philatelic, numismatic, educational, historical, or newsworthy purposes .in articles, books, journals, newspapers or albums." Such illustrations must be "in black and white", and they must be "of a size less than three-fourths or more than one and one-half, in linear dimension," of the currency illustrated. Excepted from these requirements are motion-picture films, microfilms or slides for screen projection or telecasting.[7]

The legislative history indicates that Congress intended in § 504 merely to institutionalize the practices of the Treasury Department:

The Secretary of the Treasury, under the authority vested in him by title 18, United States Code, section 474, has normally as a matter of practice for many years made exceptions to the statute by granting special permission to use illustrations of United States bonds and paper money for numismatic, historical, and educational purposes. To prevent any possibility of the illustrations being used as an instrument of fraud, such special permission has been limited to the use of black-and-white illustrations less than three-fourths or more than 1½ times the size of the genuine paper money.

It is the opinion of the Treasury Department that the printing in publications of black-and-white illustrations of paper money and other obligations and securities of the United States restricted in size will not facilitate counterfeiting. Paragraph (1) of section 504 of the United States Code, as it would be amended by the bill, will specifically permit such illus-

---

**7.** 18 U.S.C. 504, captioned "Printing and filming of United States and foreign obligations and securities," reads as follows:

Notwithstanding any other provision of this chapter, the following are permitted:

(1) the printing, publishing, or importation, or the making of importation of the necessary plates for such printing or publishing, of illustrations of—

(A) postage stamps of the United States,

(B) revenue stamps of the United States,

(C) any other obligation or other security of the United States, and

(D) postage stamps, revenue stamps, notes, bonds, and any other obligation or other security of any foreign government, bank, or corporation,

for philatelic, numismatic, educational, historical, or newsworthy purposes in articles, books, journals, newspapers, or albums (but not for advertising purposes, except illustrations of stamps and paper money in philatelic or numismatic advertising of legitimate numismatists and dealers in stamps or publishers of or dealers in philatelic or numismatic articles, books, journals, newspapers, or albums). Illustrations permitted by the foregoing provisions of this section shall be made in accordance with the following conditions—

(i) all illustrations shall be in black and white, except that illustrations of postage stamps issued by the United States or by any foreign government may be in color;

(ii) all illustrations (including illustrations of uncanceled postage stamps in color) shall be of a size less than three-fourths or more than one and one-half, in linear dimension, of each part of any matter so illustrated which is covered by subparagraph (A), (B), (C), or (D) of this paragraph, except that black and white illustrations of postage and revenue stamps issued by the United States or by any foreign government and colored illustrations of canceled postage stamps issued by the United States may be in the exact linear dimension in which the stamps were issued; and

(iii) the negatives and plates used in making the illustrations shall be destroyed after their final use in accordance with this section.

(2) the making or importation, but not for advertising purposes except philatelic advertising, of motion-picture films, microfilms or slides, for projection upon a screen or for use in telecasting, of postage and revenue stamps and other obligations and securities of the United States, and postage and revenue stamps, notes, bonds, and other obligations or securities of any foreign government, bank, or corporation. No prints or other reproductions shall be made from such films or slides, except for the purposes of paragraph (1), without the permission of the Secretary of the Treasury.

For the purposes of this section the term "postage stamp" includes postage meter stamps.

June 25, 1948, ch. 645, 62 Stat. 713; Sept. 2, 1958, Pub.L. 85–921, § 1, 72 Stat. 1771; June 20, 1968; Pub.L. 90–353, § 1, 82 Stat. 240; Oct. 14, 1970, Pub.L. 91–448, § 2, 84 Stat. 921.

trations for numismatic, educational, historical, and newsworthy purposes and will obviate the necessity of obtaining special permission from the Secretary of the Treasury in each case where the use of such illustrations is desired. A provision is included to require that the negatives and plates used in making the illustrations shall be destroyed after their final use for the purpose for which they were made. Such a requirement has formerly been imposed in cases where the Secretary of the Treasury has granted special permission as a precautionary measure and to avoid investigations of alleged violation where plates and negatives were legitimately made but were merely discarded instead of being destroyed.

S.Rep.No. 2446, 85th Cong., 2d Sess., reprinted in [1958] U.S.Code Cong. & Ad. News 5268, 5272.

### III.

Plaintiff contends that the sixth paragraph of § 474, and § 504, prohibit plaintiff and others from using illustrations of money as vehicles for the expression of opinions and ideas, except in accordance with narrow and arbitrarily defined criteria. It further contends that under the criteria set forth in these provisions the Government has the power, which it freely exercises, to determine if given material, i.e., illustrations or likenesses of U. S. currency, in a newspaper or magazine qualifies as news. It submits that in light of the adverse impact which these statutes have on the plaintiff's right of free speech and right freely and without restriction to publish and comment upon the news, they are unconstitutional on their face, and as applied to the activities of plaintiff.

More specifically, plaintiff contends that illustrations of money serve as powerful symbols in countless contexts in the reporting of, and in commentary on, the news and in the free exchange of ideas; that absent some compelling governmental need the use of such symbolic illustrations may not constitutionally be curtailed; that even if some compelling governmental need were identi-fied, the constraints upon the use of illustrations of money for symbolic purposes in public reporting and discourse must be narrowly crafted to serve that need with the minimal possible impact upon freedom of speech and of the press; and that no constitutionally cognizable compelling governmental need can be identified with respect to the challenged provisions.

The defendants contend that the sixth paragraph of § 474, and § 504, constitute reasonable exercises of the power of the government to prevent counterfeiting and to preserve and maintain the integrity of the currency system of the United States, and that they are constitutional facially and as applied to plaintiff. They assert that the restrictions imposed by the statutory scheme are directed not to the content of the articles which plaintiff seeks to illustrate, but to the manner or style in which money is illustrated, and that those restrictions are minimal. They maintain that the First Amendment does not guarantee to plaintiff the right to illustrate money as a symbol in precisely the manner plaintiff happens to consider most effective.

Defendants also challenge the existence of any case or controversy between plaintiff and defendants.

### IV.

The material facts, summarized in this section, are not in dispute.

Illustrations of money are used by plaintiff as symbols. Within the past fifteen years, plaintiff's magazines have at various times utilized illustrations, photographic or otherwise, of United States currency to symbolize the toll of inflation, to represent the economic issues at stake in a presidential election, to comment upon political scandals, and to convey information or commentary upon matters ranging from the place of the American dollar in international commercial markets to point-shaving scandals in amateur basketball. On many of these occasions some representative of the Treasury Department has warned plaintiff that specific illustrations violated Chapter 25 of Title 18.

The illustrations depict money in under-size or oversize, and they distort it. Since they appear on only one side of a printed page, the illustrations show at most only one side of any currency depicted.

1. The December 14, 1970 front cover of *Time* featured a photographic reproduction in color of approximately one-quarter of the face of a $1 federal reserve note, blown up five times and partially obscured by red printed legends. The illustration related to a story appearing in the magazine about inflation. About a month after publication, an agent of the Secret Service advised Time's production department that the illustration was illegal on the ground that federal law barred publication of any likeness of currency in color. He warned that Time must cease and desist from further violations.

2. An inside page of the July 29, 1974 issue of *Time* bore a photographic reproduction, in black and white, of approximately one-half of the face of a $1 bill, substantially obscured by an overlay of a life preserver. The illustration accompanied an essay on "How to Mobilize Against Inflation." About two months after publication, a Secret Service agent visited an attorney in Time's legal department and advised him that the illustration violated § 504, which barred any black-and-white illustration that was not less than three quarters nor more than one and one-half times actual size. The agent warned that Time must cease and desist from further violations.

3. On the February 23, 1976 front cover of *Time* appeared a photographic reproduction in black and white of a $1000 bill, substantially obscured by an overlaid printed legend and by an overlaid graphic design. The illustration related to a story within the magazine entitled "The Big Payoff," concerning allegations of international bribery by an American aircraft firm. In a letter dated February 24, 1976 the assistant legal counsel to the director of the Secret Service notified Time that in the opinion of the Department of the Treasury, the cover illustration violated § 504. The letter set forth that to qualify under § 504 the illus-

tration must not only meet the size requirements but must "appear in articles, books, journals, newspapers, or albums for historical, educational, numismatic or newsworthy purposes." The letter further stated that "[t]he Department has taken the position that in order for an illustration to be permissible it must be accompanied by information about the particualr [sic] item reproduced and cannot be used for decorative or eye-catching purposes." On February 25, 1976 Secret Service agents visited Time's legal department to warn that Time must cease and desist from further violations.

4. The November 1, 1976 front cover of *Time* carried a photographic reproduction in color of $1, $10, and $20 bills clutched in a human hand. The bills were folded lengthwise, and photographically reduced to less than one-half actual size. With respect to most of the photographed bills, only a part of an outside border, or the border and a fragment of a single numeral, was visible. The legend, "Voting Your Pocketbook," was splashed across the bottom of the cover. The illustration bore upon the impending Presidential election and the impact of inflation on voting trends, which was the subject of a story within the magazine. The assistant legal counsel to the Secret Service notified Time's legal department by letter dated November 18, 1976 that the color illustration violated § 474. The letter reviewed previous warnings which had been given to plaintiff, including those with respect to the July 29, 1974 and February 23, 1976 issues of *Time*, and advised plaintiff "to cease and desist from the use of any future reproductions of currency appearing in color . . ." The letter warned: "If Time, Incorporated fails to· comply with this request, we will refer the matter to the United States Attorney's office in the Southern District of New York for appropriate action."

5. *Fortune's* February 12, 1979 front cover photographically reproduced, in color, federal reserve notes enclosed within a money clip. The notes were folded twice widthwise, and enlarged to more than twice their actual size. Only fragments of the

outside borders of most of the notes were visible. Approximately one-third of the reverse side of the top $1,000 note was visible, substantially obscured by the overlaid money clip. The illustration pertained to a story about "America's Invisible Rich" appearing within the magazine. About nine months after publication, a Secret Service agent telephoned Time's legal department to inform it that the illustration violated §§ 474 and 504, which barred any color likeness, and that he had been instructed to give Time a " 'slap on the wrist.' "

6. The February 16, 1981 front cover of *Sports Illustrated* sported a photographic reproduction in color of $100 federal reserve notes pouring into and stuffed inside a basketball hoop and attached net. The notes were reduced to approximately one-third actual size, and each was visible only in part; most were substantially obscured by overlaid portions of other notes, by the basketball hoop or net, or by an overlaid printed caption, "Anatomy of a Scandal." The illustration related to a story in the magazine about a "point-shaving" scheme in amateur basketball. On May 18, 1981 a Secret Service agent informed Time's legal department that the illustration violated § 474 and that it would be necessary for the Service to seize all plates and materials used in connection with the production of that cover. The agent requested the names and addresses of all the printers who prepared the cover and further requested an "interview" with a member of Time's management, with counsel present if so desired. The agent stated that the statutory prohibition against publication of currency illustrations aimed to forestall the possibility that a printer involved in the process of creating the illustrations might conclude that it was easy to copy currency, and thus be inspired to do so for profit.

On occasion the Secret Service advised plaintiff to alter illustrations it intended to use.

1. The September 10, 1965 front cover of *Time* ultimately carried a painted portrait of Secretary of the Treasury Henry Fowler with an artist's black-and-white rendering of a $10 bill. Time had originally planned to use a color painting of a furled $10 federal reserve note on which the portrait of Alexander Hamilton, the legend, "United States of America," and the arabic numeral "10" would have been visible. However, when Time sought the views of the Secret Service as to the lawfulness of the background painting, it was advised that it was illegal, and the illustration was changed.

2. The July, 1977 issue of *Fortune* displayed a photographic reproduction of several rows of United States coins receding into the background, where three open doors stood in the dark sky. *Fortune's* editors had originally intended to use three $100 bills as a landscape set beneath the three open doors. Each of the bills was significantly enlarged, shown only in part, and distorted in color, shape, and size. When the legal department of Time sought the views of the Secret Service, it was told that the intended illustration was illegal.

To the editors of plaintiff's magazines the use of illustrations of money as symbols is important in reporting news, in analyzing for their readers complex financial and economic concepts, and in facilitating commentary on national and world affairs.

V.

The sixth paragraph of § 474 certainly reaches all and any likenesses of United States currency. By its terms it prohibits the printing of any "engraving, photograph, print, or impression" in the likeness of any portion of any specimen of United States currency. Thus it does not matter whether the likeness is good or bad, true to size or distorted, faithful to the true color or discolored, printed on paper similar to currency or impressed on waxpaper. Any likeness of any part of United States currency, whether or not capable of deceiving anyone, or whether or not intended to express an abstract idea, is banned by the language of the provision. The print of a drawing of the corner of a ten dollar bill is prohibited. A button showing the pyramid on the back of a one dollar bill is prohibited. A 3-foot

by 2-foot blow-up of a twenty dollar bill with substituted numbers and language is prohibited.[8] A painting of the back of a one thousand dollar bill covering the wall of a barn is prohibited. A print of a fingernail charcoal sketch of the name of the United States of America as it appears on a twenty dollar bill is prohibited. An engraving of the legend, "In God We Trust," found on the back of a ten dollar bill, is prohibited. A plastic impression of a dollar bill is prohibited.

The sixth paragraph of § 474 does not by its terms require intent to defraud, to deceive, to counterfeit. One violates the law simply by creating, executing, selling or bringing into the United States any kind of likeness of United States currency or any part thereof, whether or not the likeness is such that it might assist a counterfeiter in the reproduction of fraudulent notes or deceive a person into accepting such notes as legal tender for a debt.

Section 504 provides exemptions from the total ban imposed by the sixth paragraph of § 474. It permits the printing or publishing of "illustrations" of United States currency which meet *all* of the following requirements: (a) they must be in black and white; (b) they must be "of a size less than three-fourths or more than one and one-half, in linear dimension, of each part of any matter so illustrated"; (c) they must appear "in articles, books, journals, newspapers, or albums"; and (d) they must be for ". . . philatelic, numismatic, educational, historical, or newsworthy purposes." The word "illustration" does not appear in § 474. Neither § 504 nor any other provision of applicable law contains any definition of "illustration" or of "philatelic, numismatic, educational, historical, or newsworthy purposes."

**8.** *See Wagner v. Simon*, 412 F.Supp. 426 (W.D. Mo.1974), *affirmed*, 534 F.2d 833 (8th Cir. 1976).

**9.** Paragraph 14 of defendants' amended answer reads in part as follows:
. . . Defendants admit that in the opinion of the Department of the Treasury section 504

The Treasury Department, which through the Secret Service is primarily responsible for the enforcement of the counterfeiting laws, requires in addition that an illustration otherwise permitted by § 504 "be accompanied by numismatic, educational, historical or newsworthy information relating directly to the item that is illustrated." [9] The Treasury Department has also taken the position that § 504 does not exempt illustrations which are "used primarily for decorative or eye-catching purposes."

## VI.

"[C]oncrete legal issues, presented in actual cases, not abstractions" are an absolute requisite for adjudication of legal disputes. *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 423, 61 S.Ct. 291, 306, 85 L.Ed. 1143 (1940). *See also Golden v. Zwickler*, 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969); *Electric Bond & Share Co. v. Securities and Exchange Commission*, 303 U.S. 419, 443, 58 S.Ct. 678, 687, 82 L.Ed. 936 (1938).

Although 28 U.S.C. § 2201 authorizes the court to declare the rights of the parties before it, the statute permits no relief which is not "consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

prohibits illustrations used primarily for decorative or eye-catching purposes and also requires that an illustration permitted by the section be accompanied by numismatic, educational, historical or newsworthy information relating directly to the item that is illustrated.

Thus the initial inquiry is whether there exists a justiciable controversy sufficient to support the jurisdiction of a federal court. U.S.Const. art. III, § 2.[10]

The Government asserts an absence of justiciability because plaintiff has not been arrested and prosecuted under the statutes. The gist of its argument is that a finding of justiciability may not be predicated upon a pattern of warnings: only an actual prosecution creates an Article III controversy.

This is not the law. "[I]t is not necessary that [plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). Justiciability exists where plaintiff's "challenge is to those specific provisions of [federal] law which have provided the basis for threats of criminal prosecution . . ." *Id.* "[Plaintiff] should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bol-*

ton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).[11]

Plaintiff as a magazine publisher claims First Amendment protection for its use of illustrations of currency for symbolic purposes in connection with articles it has published and intends to publish in the future in its various magazines. The provisions of the sixth paragraph of § 474, and of § 504, read together, proscribe the creation or publication of such illustrations: by the very terms of those provisions the creation of illustrations such as those already published by plaintiff constitutes a federal offense, regardless of intent or malice. Defendants certainly regard illustrations of United States currency already used by plaintiff as contravening the statutory prohibitions, and have repeatedly warned plaintiff of its criminal transgressions. Plaintiff has been told that if it does not cease and desist "from the use of any future reproductions of currency appearing in color," the matter will be turned over to the United States Attorney for "appropriate action."[12] There have been relatively recent

---

**10.** Article III, § 2 of the Constitution provides in pertinent part:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; . . .—to Controversies to which the United States shall be a Party; . . .

**11.** In *Doe v. Bolton*, the Court held that where physicians licensed by the state who are consulted by pregnant women attack the constitutionality of a "recent and not moribund" state abortion statute which is the successor to another abortion statute under which physicians were prosecuted, they have standing to challenge the statute and a justiciable controversy is presented. 410 U.S. at 188–189, 93 S.Ct. at 745.

**12.** Letter to associate counsel of plaintiff from assistant legal counsel of the Secret Service, dated November 18, 1976:

> We are again advising Time, Incorporated to cease and desist from the use of any future reproductions of currency appearing in color or for advertising purposes. If Time, Incorporated fails to comply with this request, we will refer the matter to the United States Attorney's office in the Southern District of New York for appropriate action.

This element of threatened prosecution is what distinguishes this case from *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). In *Poe v. Ullman*, Connecticut statutes enacted in 1879 prohibited the use of contraceptive devices and the dispensation of medical advice concerning that use. There had been only one prosecution thereunder, a test case in 1940 to determine constitutionality. Plaintiffs in *Poe* sued for declaratory judgments, challenging the statutes on Fourteenth Amendment grounds. The Court found no justiciable controversy because there was no threat of prosecution:

> "The party who invokes the power [to annul legislation on grounds of its unconstitutionality] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement . . ."

367 U.S. at 504–505, 81 S.Ct. at 1756, quoting from *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). There was no allegation, explicit or implicit, that appellee Ullman threatened to prosecute plaintiffs under the statutes. 367 U.S. at 501, 81 S.Ct. at 1754.

This case is in a different factual posture than *Poe v. Ullman*. There have been many warnings emanating from the Treasury Department over the years, which are discussed in the

court cases involving violations of the sixth paragraph of § 474, although only one of them entailed a constitutional challenge analogous to that proffered by plaintiff in this case.[13]

The absence to date of prosecutorial action with respect to plaintiff does not diminish or lessen the immediacy and ripeness of this controversy: "[c]ontingency of official enforcement of clearly applicable criminal prohibitions should not be grounds for denying present review, even if there is no demonstrated threat of prosecution." 13 *Wright, Miller & Cooper, Federal Practice and Procedure*: Jurisdiction § 3532 at 247 (1975). The warnings emanating from the Treasury Department have been over a period of at least ten years. The United States Attorney has never disavowed the possibility of prosecution.[14] Despite the lack of a federal indictment, "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, supra, 312 U.S. at 273, 61 S.Ct. at 512. The matter before me is ripe for Article III adjudication.

## VII.

As a threshold matter, I consider 1) whether plaintiff's use of illustrations of money in various contexts constitutes in its content speech which is protected by the First Amendment,[15] and 2) the nature of

---

text at pp. 1377–1379, *supra*. There have also been various criminal prosecutions under § 474, *see* fn. 13, *infra*.

13. *Wagner v. Simon*, 412 F.Supp. 426 (W.D. Mo.1974), aff'd, 534 F.2d 833 (8th Cir. 1976). *See* discussion, *infra*, on p. 1388.

In *Wholesale Vendors of Texas, Inc. v. United States*, 361 F.Supp. 1045 (N.D.Tex.), aff'd mem., 486 F.2d 1402 (5th Cir. 1973), a manufacturer of novelty items sold through vending machines sought a judgment declaring, *inter alia*, its right to manufacture "play money" seized from its premises by agents of the Secret Service. The district court denied the request, stating its unwillingness "to hold that the Treasury and Secret Service agents were without authority to seize and retain the [likenesses] in question." 361 F.Supp. at 1048. The plaintiff had received conflicting information from various officers of the Department of Treasury. No First Amendment interest was asserted and no constitutional question was decided.

In *Koran v. United States*, 408 F.2d 1321 (5th Cir. 1969), *cert. denied*, 402 U.S. 948, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1971), defendant was convicted for the unlawful possession of a one-dollar silver certificate under the fifth paragraph and for unlawful printing of the certificate under the sixth paragraph of § 474. Defendant had discussed plans to print a large quantity of counterfeit currency with a government informer which led to his investigation and arrest by the Secret Service. The case involved a Fourth Amendment claim; no First Amendment interest was asserted nor did the Court of Appeals mention that issue.

In *Webb v. United States*, 216 F.2d 151 (6th Cir. 1954), the Court of Appeals affirmed the conviction under the sixth paragraph of § 474 of two people engaged in a confidence game which included an effort to defraud the victim through the use of crudely counterfeited money. The likenesses were executed with the intent to commit a crime. The constitutionality of § 474 was not mentioned, and no First Amendment claim was asserted.

14. It is instructive to note the posture of plaintiffs in *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). The civic associations there filed suit for declaratory and injunctive relief upon receiving advice from the Postmaster in White Plains, New York, that continuation of their practice of using letter boxes for the delivery of unstamped notices could result in a fine up to $300. There is no indication that any member of the civic organizations had any contact with the Justice Department or any other law enforcement agency respecting their alleged violations of the postal statute. While a court may, *sua sponte*, raise the question of subject matter jurisdiction, neither the district judge, nor the Court of Appeals, nor any of the five justices of the United States Supreme Court who wrote opinions in the case voiced any question as to the justiciability of the matter.

15. When a court is asked to determine whether a species of speech is covered by the First Amendment, it must look to the content of the expression. *See Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980) (commercial speech); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) (libel); *Miller v. California*, 413 U.S. 15, 23, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973) (obscenity); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–572, 62 S.Ct. 766, 768, 86 L.Ed. 1031 (1942) (fighting words).

the statutory provisions which are challenged.

1) *Plaintiff's illustrations of money as protected speech.*

██ The illustrations reviewed in the earlier portion of this opinion make it clear that plaintiff used illustrations of money symbolically—to dramatize or illustrate a set of facts, an existing condition, a moral crisis, a course of conduct. "A picture," it has been said, "is worth a thousand words." Certainly the use by plaintiff of illustrations of money in connection with its various magazine articles gave emphasis, thrust, and even poignancy to the messages of the articles to which the illustrations pertained. A dollar bill worth seventy-three cents, with George Washington shedding a tear, constituted graphic editorial commentary on the ravages of inflation; a hoop and net stuffed to overflowing with hundred dollar bills was a powerful statement of the impact of gambling on the sport of basketball. The image of money is a powerful, expressive symbol, of significant value to members of the press, including plaintiff, in communicating information and ideas on a wide range of issues of vital public interest.[16] It is, to state the obvious, a particularly effective symbol for the communication of ideas about money itself. The economy, inflation, money supply, foreign trade imbalances, interest rates, and national deficit have all been part of the stuff of analytical and interpretive news reporting in recent years—reporting which has driven home to the individual citizen the impact of these matters on his or her daily life. To the extent that illustrations of money as symbols, used in connection with newspaper and magazine reporting on such matters, have explicated or made more comprehensible the very complicated concepts being treated, to that extent the public has been well served.

Since the use of the symbol of money by plaintiff has been, and will continue to be,

intimately related to the expression and communication of ideas, I find that the publication or printing of illustrations of United States currency by plaintiff is protected speech under the First Amendment. It does not entail expression which is deemed by the nature of its content to be subject to regulation in the interests of the public weal. Publishing illustrations of currency does not involve speech characterized by the Supreme Court as posing a "clear and present danger," *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), as "fighting words," *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), as "defamation," *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), as "obscenity," *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), as "libel," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), or as "commercial speech," *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

Thus absent constitutionally permissible overriding considerations, plaintiff has a First Amendment right to publish or print illustrations of United States currency.

2) *The nature of the challenged statutory provisions.*

The sixth paragraph of § 474 prescribes a comprehensive ban on all likenesses of United States currency. It is triggered by the unauthorized presence of an illustration of money, as symbol or otherwise, and it purports totally to remove that illustration from the national discourse. It is a subject matter regulation.

Section 504 is a content-based measure which would allow certain illustrations of money ("black and white" and "less than three-fourths or more than one and one-half, in linear dimension, of each part of any matter so illustrated") to appear in

---

**16.** "Because appellants' claims are rooted in the First Amendment, they are entitled to rely on the impact of the ordinance on the expressive activities of others as well as their own."

*Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981).

certain forums ("articles, books, journals, newspapers, or albums"), provided that they were created for a particular purpose ("philatelic, numismatic, educational, historical, or newsworthy"). The statute necessarily vests officers of the executive branch with power to determine the content and purpose of the illustrations. No guiding definitions are set out as to what constitutes an illustration or a philatelic, numismatic, educational, historical, or newsworthy purpose.

In summary, the sixth paragraph of § 474 targets one particular set of illustrations (illustrations of money) for proscription while § 504 is a line-drawing regulation involving the discretion of government officials with respect to content, purpose, and location in determining the availability of exemptions from that proscription.

## VIII.

■ The determination of the nature of plaintiff's speech and of the challenged statutes aids in ascertaining the applicable legal principles developed over the years in First Amendment law.[17] If speech is protected by the First Amendment, a statute which impinges upon that speech must be narrowly drawn so as to be an efficacious means of achieving permissible objectives of the government. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The statute must be narrowly aimed at the permissible objectives and it must to the extent possible avoid impinging on protected speech. *Grayned v. City of Rockford*, 408 U.S. 104, 116–117, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).

"Although [the government] may enact regulations in the interest of the public safety, health, welfare or convenience, these may not abridge the individual liberties secured by the Constitution to those who wish to speak, write, print or circulate information or opinion." *Schneider v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939). Regulations addressed to legitimate governmental goals cannot "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307, 84 S.Ct. 1302, 1313, 12 L.Ed.2d 325 (1964). This is the "overbreadth doctrine": a law is void on its face if it "does not aim specifically at evils within the allowable area of [government] control but ... sweeps within its ambit other activities that in ordinary circumstances constitute an exercise" of protected rights. *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940).

■ Where a statute impinges upon protected speech, the burden is on the government to establish the validity of its asserted interests. *Schneider v. State, supra*, 308 U.S. at 161, 60 S.Ct. at 150. The judiciary has an overriding obligation "to assess the substantiality of the justification[s] offered," *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 69, 101 S.Ct. 2176, 2183, 68 L.Ed.2d 671 (1981), and to ensure that the regulation promotes legitimate governmental ends with minimal intrusion on First Amendment freedoms. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Hynes v. Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). "The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton v. Tucker, supra*, 364 U.S. at 488, 81 S.Ct. at 252. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). *See Keyishian v. Board of Regents*, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967).

■ Where the government regulation is aimed at the non-communicative impact of

---

17. *See* A. Cox, *Freedom of Expression* (1981) at 6: "Classification is important ... because the earlier efforts to bring all first amendment cases under a 'clear and present danger' test have rightly given way to a variety of standards keyed to the character of the restriction."

protected speech and at harm not caused by the ideas or information contained in that speech, the regulation may be upheld so long as it does not *unduly* constrict the flow of information. *See Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941) [upholding ordinance requiring parade permits where official discretion was limited exclusively to considerations of time, place, and manner: "[T]he question in a particular case is whether [a] control is exerted so as not to *deny* or *unwarrantedly* abridge the right of assembly and the opportunities for the communication of thought . . ." *Id.* (emphasis added) ].

Justice Powell's opinion for the Court in *Consolidated Edison v. Public Service Commission*, 447 U.S. 530, 100 S.Ct. 2326, 68 L.Ed.2d 671 (1980), sets forth an instructive framework for analysis of the constitutionality of statutes that bear to some degree on speech. In *Consolidated Edison*, the Court struck down an order by the New York Public Service Commission that prohibited public utilities from including, with monthly bill mailings, inserts which discussed controversial issues of public policy. The order, according to the Court, directly infringed upon freedom of speech protected by the First and Fourteenth Amendments.

Justice Powell's opinion, noting that a restriction which impinges upon speech is not *per se* invalid, emphasizes that the burden to show the constitutionality of such a restriction is on the state. The opinion suggests analysis in terms of whether the restriction is a reasonable time, place or manner restriction, or whether it is a permissible subject matter regulation, or whether it is narrowly crafted to serve a compelling state interest:

> The Commission's ban on bill inserts is not, of course, invalid merely because it imposes a limitation upon speech. (Citation omitted) We must consider whether the State can demonstrate that its regulation is constitutionally permissible. The Commission's arguments require us to consider three theories that might justify the state action. We must determine whether the prohibition is (i) a reasonable time, place, or manner restriction, (ii) a permissible subject-matter regulation, or (iii) a narrowly tailored means of serving a compelling state interest.

*Consolidated Edison v. Public Service Commission, supra*, 447 U.S. at 535, 100 S.Ct. at 2332.

I turn to such analysis of the challenged provisions.

### IX.

Sections 474 and 504 are interrelated in that § 474 imposes a complete bar to the use of illustrations of money, whereas § 504 exempts from that bar illustrations which satisfy certain criteria as to size (less than three-fourths or more than one and one-half the size of currency), color (must be rendered in black and white), forum (must appear in articles, books, journals, newspapers or albums), and purpose (must be for "philatelic, numismatic, educational, historical, or newsworthy" purpose). Section 504 broadly exempts from § 474, without applying the above criteria, pictures of currency to be used for non-advertising purposes in motion pictures or television.

Because of the interrelationship of Sections 474 and 504, the ultimate constitutional analysis must be directed to the impact of these sections in tandem upon plaintiff's activities—the extent, if any, to which they prevent or deter constitutionally protected activities. Where it is alleged, as plaintiff alleges here, that threatened enforcement of provisions of law infringe upon a protected liberty, "the standard of review is determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed." *Schad v. Borough of Mt. Ephraim, supra*, 452 U.S. at 68, 101 S.Ct. at 2182, citing to *Thomas v. Collins*, 323 U.S. 516, 529–530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945).

Preliminary analysis of § 474 and § 504 separately will be useful in ultimate determination of their combined impact upon plaintiff's First Amendment rights.

*1. Section 474* ·

The sixth paragraph of § 474 does not enunciate a time, place or manner restriction. Time, place, and manner restrictions are geared toward *methods* of speech and seek to accommodate a particular way of expression with the safety or health interests of the community. "[T]he essence of time, place, or manner regulation lies in the recognition that various methods of speech, regardless of their content, may frustrate legitimate governmental goals." *Consolidated Edison v. Public Service Commission, supra,* 447 U.S. at 536, 100 S.Ct. at 2332. *See also Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (for sale signs); *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, supra* (pharmaceutical advertisements); *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (sound trucks); *Cox v. New Hampshire, supra* (parade permits).[18]

As noted in Section VII, *supra,* in proscribing the use of illustrations of money, as symbols or otherwise, the sixth paragraph of § 474 constitutes subject-matter regulation. Subject-matter regulations encounter great difficulty passing constitutional muster in our jurisprudence, and regulations based on subject matter of speech have been approved only in narrow circumstances. Generally, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972); *see Cox v. Louisiana,* 379 U.S. 536, 580–581, 85 S.Ct. 453, 469, 13 L.Ed.2d 471 (1965) (opinion of Black, J.). "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth." *Consolidated*

*Edison v. Public Service Commission, supra,* 447 U.S. at 538, 100 S.Ct. at 2333.

In *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), the Supreme Court held that the United States Government could prohibit partisan political speech on a military base even though civilian speakers had been permitted to lecture on other subjects. The exclusion was justified by the historical tradition "of keeping official military activities ... wholly free of entanglement with partisan political campaigns of any kind." *Id.* at 839, 96 S.Ct. at 1218. Thus the decision interpreted the public's right of access in light of "the unique character of the Government property upon which the expression is to take place." *Id.* at 842, 96 S.Ct. at 1219. (Powell, J., concurring).

In *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (opinion of Blackmun, J.), a plurality similarly concluded that a city transit system that rented space in its buses for commercial advertisements was not under a duty to provide space for partisan political commercials. The Court gave weight to the city's fear that partisan political ads might jeopardize long-term commercial revenue and lead to accusations of favoritism. *Id.* at 304, 94 S.Ct. at 2717.

Both *Greer* and *Lehman* concerned the relationship of political speech to a particular governmental facility: the Court concluded that partisan political speech posed a danger to the operation of these facilities.

The flat ban on the journalistic or public use of the symbol of money cannot be equated with the *Greer* and *Lehman* cases. This case does not concern the availability of a public facility for the exercise of the free speech right by private parties. Time does not seek to use the United States Courthouse in Foley Square as a facility from which to propound its views. The

---

**18.** Even if the provision could be construed as a time, place or manner restriction, its concern with the subject matter of speech, i.e., the symbol of money, would violate the traditional rule that to be constitutional, time, place or manner restrictions must be applied to all speech irrespective of content. *Consolidated Edison v.*

*Public Service Commission, supra,* 447 U.S. at 536, 100 S.Ct. at 2332. *Carey v. Brown,* 447 U.S. 455, 470, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975).

sixth paragraph of § 474 cannot be upheld by reliance upon those cases that rest on the special interests of a government in operating its own property.

The sixth paragraph of § 474 does impinge on plaintiff's freedom of speech, since plaintiff has a protected right to use illustrations of money as symbols in connection with its articles (*See* Section VII, *supra*), and § 474 prohibits such use. Thus the question, as posed by Justice Powell in *Consolidated Edison*, is whether that prohibition is "a narrowly tailored means of serving a compelling state interest." 447 U.S. at 535, 100 S.Ct. at 2332. This court has an overriding obligation "to assess the substantiality of the justification[s] offered" and to ensure that the regulation promotes legitimate governmental ends with the minimal intrusion on First Amendment freedoms. *Village of Schaumburg v. Citizens for a Better Environment, supra*, 444 U.S. at 636, 100 S.Ct. at 836; *Schad v. Borough of Mt. Ephraim, supra*, 452 U.S. at 69, 101 S.Ct. at 2183.

The justifications offered by defendants for the prohibitions contained in the sixth paragraph of § 474 are basically twofold. The first justification is that the prohibitions prevent counterfeiting. The second justification is that the prohibitions protect "the value [of] and respect for instruments issued as the official obligations and securities of the United States."

The government has a compelling interest in preventing counterfeiting and thus maintaining the integrity of the nation's currency system. Is the sixth paragraph of § 474, however, a narrowly tailored means of preventing counterfeiting of United States currency? It casts its net over any and all likenesses of such currency whether or not any given likeness has the capacity to deceive or to act as a vehicle for counter-feiting. Thus it is overbroad. *Thornhill v. Alabama, supra*, 310 U.S. at 97, 60 S.Ct. at 741. Where protected speech, namely the publication of illustrations of United States currency, is involved, the law must be drawn with "narrow specificity" so as to avoid any unnecessary infringement on that speech. *NAACP v. Button, supra*, 371 U.S. at 433, 83 S.Ct. at 338.

That requirement is not satisfied by § 474's proscription of *all* likenesses. Neither the illustrations of money used by plaintiff nor the plates used to print those illustrations can be used to counterfeit money, or as counterfeit money.[19] To criminalize illustrations such as those employed by plaintiff that have no utility for fraud or forgery and that cannot be used for counterfeiting, but which do serve as vehicles for artistic or journalistic expression, violates the First Amendment by interfering unduly with protected speech. There are less intrusive ways to combat counterfeiting without totally removing illustrations of money from the national discourse.

■ Defendants' second justification for the § 474 prohibitions—that they protect the value of and respect for the official obligations of the United States—is quite simply a constitutionally impermissible one. When this justification is analyzed, it can only mean that § 474 bans the use of illustrations of money because of the ideas such illustrations may symbolically represent. This runs counter to the constitutional doctrine that the government may neither prohibit nor prescribe the form or content of individual expression, absent a compelling state interest. *Police Department of the City of Chicago v. Mosley, supra*, 408 U.S. at 95, 98, 92 S.Ct. at 2291. The government cannot compel or prohibit respect for any symbol or idea in this country. *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75

---

**19.** Plaintiff claims, and defendant denies, that the illustrations cannot be used for counterfeiting or as counterfeit currency. Plaintiff has submitted affidavits to the effect that "the materials used to produce four-color offset magazine covers showing usually distorted illustrations of currency can be of little value to someone attempting to counterfeit a hand-engraved, two-sided dollar bill." (*See* Affidavit of Henry A. Grunwald). Common sense does not permit a contrary conclusion. Defendants do not seriously contend otherwise. Plaintiff has no objection to that part of the statute which requires that materials used to print representations of money be destroyed after their final use.

L.Ed. 1117 (1931) (state prohibition of display of red flag struck down); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (mandatory salute of the American flag invalidated); *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) (conviction for "disrespectful" language about the flag set aside); *Schacht v. United States*, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970) (punishment for theatrical use of a uniform which was critical of the Army invalidated). Neither plaintiff nor any citizen can be compelled by the government to pay respect to the dollar. The sixth paragraph of § 474 cannot be justified as protecting, by restraining speech, "the value [of] and respect for" currency issued by the government.[20]

In *Wagner v. Simon*, 412 F.Supp. 426 (W.D.Mo.1974), aff'd, 534 F.2d 833 (8th Cir. 1976), plaintiff sought a declaratory judgment that the sixth paragraph of § 474 had been unconstitutionally applied to a 36″ × 15″ reproduction he had made in the likeness of a twenty dollar federal reserve note with substantial modifications. These modifications included, *inter alia*, changing the picture of President Jackson to President Nixon, replacing the words "Federal Reserve Note" with the words "Inflationary Note," substituting "Thirty" for "Twenty", and drawing a teapot in place of the Federal Reserve seal. The finished product was intended as a political statement critical of President Nixon's economic policies and his involvement in the "Watergate" affair.

The district court held that the poster fell within the specific proscriptions of the sixth paragraph of § 474 and that the provision was not overbroad. The sixth paragraph of § 474 was, the court held, "aimed only at the suppression of the non-communicative conduct within its scope," and was "an appropriately narrow means of protecting a substantial governmental interest" which did "not necessarily interfere with First Amendment rights." 412 F.Supp. at 432.

*Wagner* arose in a factual context that distinguishes it from the instant case. First, the plaintiff in *Wagner* wanted to sell his product, a commercial aspect not present here, although Time is in the publishing business for a profit. Second, *Wagner* involved an individual artist; this case involves a plaintiff which is a member of the press and which makes the argument that illustrations of currency are vitally necessary to the dissemination of news. No such argument was asserted in *Wagner*. As Justice Holmes once observed, "[l]aws frequently are enforced which the court recognizes as possibly or probably invalid if attacked by a different interest or in a different way." *Quong Wing v. Kirkendall*, 223 U.S. 59, 64, 32 S.Ct. 192, 193, 56 L.Ed. 350 (1912).

In any event, the *Wagner* district court did not engage in the analytical process now called for by *Consolidated Edison, Schad, Grayned* and other free speech/free press cases.[21] It did not examine the statute, assess its justifications, nor probe its nexus to the governmental interest purported to be served by it. It did not even indicate whether Wagner's work had any First Amendment protection. I decline to follow it.

*2) Section 504*

Although the prohibitions in § 474 do not withstand constitutional scrutiny, it is necessary to examine § 504, since if its provisions permitted what § 474 prohibits, a constitutional confrontation would be avoided.

Insofar as plaintiff's illustrations are concerned, Section 504 leaves in place the § 474 proscriptions, and in the course of various of the warnings with respect to plaintiff's violations of law, government representatives have invoked § 504 (*see* pp. 1377–1379, *supra*). Be that as it may, § 504 presents troublesome constitutional problems of its own.

---

**20.** This second justification so clearly presents an impermissible state interest that it is not necessary to determine, with respect to it, whether a less intrusive approach would be possible.

**21.** Of these cases, only *Grayned* had been decided at the time of the *Wagner* decision.

Section 504 allows black and white illustrations of United States currency less than three-fourths or more than one and one-half, in linear dimension, of each part of any matter illustrated, appearing in articles, books, journals, newspapers or albums for philatelic, numismatic, educational, historical or newsworthy purposes. Thus § 504 draws lines: it is a time, place and manner regulation that creates distinctions among illustrations of currency based on criteria pertaining to content, purpose, and forum in which the illustration appears. Section 504 must meet the constitutional standard for time, place or manner regulations: it is to be applied to all speech irrespective of content. *Consolidated Edison v. Public Service Commission, supra*, 447 U.S. at 536, 100 S.Ct. at 2332; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

Section 504's concern with "philatelic, numismatic, educational, historical, or newsworthy" purposes is constitutionally impermissible. Governmental action that regulates speech on the basis of its subject matter " 'slip[s] from the neutrality of time, place, and circumstance into a concern about content.' " *Police Department of the City of Chicago v. Mosley, supra*, 408 U.S. at 99, 92 S.Ct. at 2292, quoting Kalven, *The Concept of the Public Forum: Cox v. Louisiana*, 1965 Sup.Ct.Rev. 1, 29. In enforcing § 504, the government decides whether the purpose of the illustration is "philatelic, numismatic, educational, historical or newsworthy" and whether the forum in which it appears is indeed an article, a book, a journal, a newspaper or an album. Such decisions are based on content or subject matter. Succinctly put, § 504 requires judgments about the nature and quality of the message contained in the illustration, about the nature and quality of the article to which the illustration relates, and about the nature of the forum containing the illustration, types of judgment the First Amendment prohibits the government from making. *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971); *Thornhill v. Alabama, supra*.

In *Village of Schaumburg v. Citizens for a Better Environment, supra*, a municipal ordinance required charitable organizations which desired to raise money in house-to-house solicitation to demonstrate that at least 75% of the receipts would go to charitable purposes. 444 U.S. at 624, 100 S.Ct. at 829. Plaintiff, a charitable organization, sued to invalidate the ordinance on the ground that it was overbroad because it barred advocacy-oriented causes whose receipts of contributions were used for salaries and organizational costs, not charitable purposes.

The United States Supreme Court agreed with plaintiff's contention that the statute bore little relation to its goal of preventing fraud or crime and constituted too great an intrusion on plaintiff's free speech right. 444 U.S. at 636, 100 S.Ct. at 836. The 75% requirement was perceived to bear heavily on freedom of speech and could only be countenanced if it enjoyed a significant relationship to substantial governmental interests. *Id.* Finding these interests substantial, the Court nonetheless found that they were only peripherally served by the ordinance and could be served by a more narrowly drawn law. *Id.*

*Village of Schaumburg* demands a tight nexus between the requirements of a statute and the promotion of the governmental goals, especially where a constitutional right is implicated. *Id.* at 639, 100 S.Ct. at 837. Such a nexus is missing here. There is no relationship between the distinctions among the purposes and forums, and the evils that the statute purportedly targets. Will an illustration in a numismatic journal be any less susceptible to forgery than one appearing in *Playboy*? Will a newsworthy illustration of money in a book be any less susceptible to forgery than a non-newsworthy item? Indeed, the newsworthiness of an illustration has no bearing on its capacity (or lack thereof) to deceive a person or to facilitate a criminal's attempt at forgery. Neither the purpose to which an illustration is put nor the forum in which it appears has any relation to the prevention of counterfeiting. The federal statutory scheme evidenced in § 504 is insufficiently

related to the governmental interests it seeks to promote to justify intrusion on protected speech.

Just as an organization which spends more than 25% of its receipts for non-charitable purposes is no more likely to commit fraud or crime than an organization spending less than 25% of its receipts for non-charitable purposes, the illustrations banned by the provisions under challenge here are no more likely to threaten the public welfare than those arbitrarily allowed. As a charity's ability to fulfill the 75% requirement bears no relationship to the likelihood of its solicitors to commit fraud or crime, the newsworthiness or educational value of an illustration, or the forum in which it appears, has little to do with its capacity to defraud the public.

As an exception to the absolute prohibitions of § 474, the lines drawn by § 504 do not directly promote the government's interest in preventing counterfeiting through the least restrictive means, and they intrude unnecessarily upon plaintiff's freedom of speech. *Shelton v. Tucker, supra,* 364 U.S. at 488, 81 S.Ct. at 252.[22]

*Hynes v. Oradell, supra,* teaches that a law which fails to inform the public how to conform, and which fails to provide narrow, specific standards for those officials who must apply it, is void for vagueness. 425 U.S. at 622, 96 S.Ct. at 1761. Thus there is also a problem of vagueness with § 504. The determination of what is "philatelic, numismatic, educational, historical, or newsworthy" is rife with assumption and open to varying interpretation. The definition of a journal, newspaper or album is anyone's game to play. It has been long recognized that time, place, and manner regulations which vest in law enforcement authorities the capacity for discretionary enforcement or subjective definition of an offense are instruments for censorship.[23] *Lovell v. Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938); *Heffron v. ISKCON,* 452 U.S. 640, 101 S.Ct. 2558, 69 L.Ed.2d 298 (1981).

The distinctions drawn by § 504 do not clearly delineate the area of forbidden conduct, which forces the public to guess at its essential meaning in violation of due process of law. *Cramp v. Board of Public Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); *Hynes v. Mayor of Oradell, supra,* 425 U.S. at 620, 96 S.Ct. at 1760. This operates to produce a chilling effect on speech, a vice condemned by the First

---

**22.** Section 504 also suffers from both under-inclusiveness and over-inclusiveness. It is under-inclusive in that it exempts the broadcast media. It is over-inclusive in that its prohibition bans the finished product irrespective of its ability to perpetrate fraud or crime as well as the plates and the negatives, more likely raw materials for counterfeiting currency. This under- and over-inclusivity indicates a failure to be "a narrowly tailored means of serving a compelling state interest." *Consolidated Edison v. Public Service Commission, supra,* 447 U.S. at 535, 100 S.Ct. at 2332.

**23.** The vice of vagueness is starkly illustrated by the two additional requirements which have been communicated to plaintiff by agents of the Treasury Department. *See* fn. 9, *supra.*

Not only must an illustration meet each and every one of the criteria set out in Section 504: it must also "be accompanied by numismatic, educational, historical, or newsworthy information relating directly to the item that is illustrated." This requirement shrinks Section 504's exceptions from Section 474's prohibitions to the vanishing point: even if an illustration were to meet all of Section 504's criteria, it would still be illegal if it did not relate to the specific piece of currency so illustrated. Not only does that additional requirement have no bearing on the asserted goal of preventing forgery but it also represents a Governmental attempt to dictate the contents of a message, implicating immediate and close constitutional scrutiny. *See Shelton v. Tucker, supra.*

The second requirement put forth by Treasury insists that "decorative or eye-catching" illustrations are not allowed. A front cover illustration that meets all § 504 criteria but is eye-catching would be banned. The questions to ask are: what is "eye catching"? Who determines that issue? What does "eye-catching" have to do with the prevention of forgery?

Section 504 by its terms does not require that illustrations be accompanied by information relating to the item illustrated, nor does it require that the illustration not be eye-catching. The Treasury Department's position, thus, highlights the variance to which interpretation of the law is subject. The absurdity is compounded by the fact that there are very few currency notes in or out of circulation that would provide the basis for a news story.

Amendment. *Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Gooding v. Wilson, supra.*

## X.

The original version of the sixth paragraph of § 474 was drafted in 1864 as a financial measure to assure the availability of funds for the War Between the States. In the meantime, technology has come a long way and this case represents a clash between an old law and the needs of modern society. Nowadays, if someone is going to counterfeit money, he or she has far more efficient and direct ways of doing the job than relying on Time's illustrations, all of which are distorted.

There is no material issue of fact. I find that the sixth paragraph of 18 U.S.C. § 474, and 18 U.S.C. § 504, are unconstitutional on their face and as applied to plaintiff. Plaintiff is entitled to judgment as a matter of law on its motion for summary judgment. Defendant's cross-motion for summary judgment is denied. A declaratory judgment to that effect shall be entered.[24]

Submit judgment.

**24.** Since a declaratory judgment is to be entered, and defendants will be bound by that judgment, I see no reason to enjoin defendants. *Poe v. Gerstein,* 417 U.S. 281, 94 S.Ct. 2247, 41 L.Ed.2d 70 (1974); *Roe v. Wade,* 410 U.S. 113, 166, 93 S.Ct. 705, 733, 35 L.Ed.2d 147 (1973); *Dombrowski v. Pfister,* 380 U.S. 479, 484–485, 85 S.Ct. 1116, 1119, 14 L.Ed.2d 22 (1965).